## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

REBECCA LOHMAN,                          Case No. 1:10-cv-628
          Plaintiff                      Dlott, J.
                                         Litkovitz, M.J.
     vs


COMMISSIONER OF                          **REPORT AND**
SOCIAL SECURITY,                         **RECOMMENDATION**
          Defendant


Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI).  This matter is before the Court on plaintiff's Statement

of Errors (Doc. 16), the Commissioner's response in opposition (Doc. 21), and plaintiff's reply

memorandum.  (Doc. 22).

### PROCEDURAL BACKGROUND

Plaintiff was born in 1982 and was 26 years old at the time of the decision of the

administrative law judge (ALJ).  She has a high school education and no past relevant work

experience.  (Tr. 98, 110).  Plaintiff filed an SSI application on February 23, 2007, alleging a

disability onset date of January 3, 2007, due to multiple sclerosis.  (Tr. 85-87, 97).  The

application was denied initially and upon reconsideration.  Plaintiff then requested and was

granted a de novo hearing before ALJ Deborah Smith.  (Tr. 20-50).  Plaintiff, who was

represented by counsel, appeared at the hearing.  (Tr. 24-43).  A vocational expert (VE), George

Parsons, also appeared and testified at the hearing.  (Tr. 39-42).

On October 13, 2009, the ALJ issued a decision denying plaintiff's SSI application.

(Tr. 8-19). The ALJ determined that plaintiff suffers from the severe impairment of multiple sclerosis (MS). (Tr. 13). The ALJ found that plaintiff's impairment does not meet or equal the requirements of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listing). (*Id*.). The ALJ specifically found that plaintiff's MS does not meet the criteria of Listing 11.09 in severity. (*Id*.).

The ALJ determined that plaintiff retains the residual functional capacity (RFC) to perform work at the light exertional level as defined in 20 C.F.R. § 416.967(b) with the following exceptions: She can lift up to 25 pounds occasionally and up to 20 pounds frequently; she can stand/walk and sit for about 6 hours in an 8-hour workday; she can never climb ladders/ropes/scaffolds; she cannot perform work requiring depth perception; she should avoid concentrated exposure to extreme heat or cold and to hazards such as machinery or unprotected heights; and she cannot perform outdoor work. (Tr. 14). The ALJ further found that plaintiff's medically determinable impairment could reasonably be expected to cause some of the alleged symptoms; however, plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not credible to the extent they are inconsistent with plaintiff's RFC. (Tr. 16).

The ALJ determined that plaintiff has no past relevant work.[1] (Tr. 18). Using Medical-Vocational Rule 202.20 as a framework for decision-making, and relying on the testimony of the VE, the ALJ determined there are jobs that exist in significant numbers in the national economy that plaintiff could perform given the RFC to perform a limited range of light

---

[1]Plaintiff has worked in the past as a fast food worker, a housekeeper, and a stock worker, but she held these jobs for very brief periods of time. (Tr. 110).

work. (*Id.*). The ALJ found based on the VE's testimony that even if a sit/stand option were required, plaintiff could still perform the sedentary jobs listed by the VE. (Tr. 19). Consequently, the ALJ concluded that plaintiff is not disabled under the Social Security Act and is therefore not entitled to SSI. (*Id.*).

The Appeals Council denied plaintiff's request for review, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments. An impairment can be considered as not

3

severe only if the impairment is a "slight abnormality" which has such a minimal effect on the

individual that it would not be expected to interfere with the individual's ability to work,

irrespective of age, education, and work experience. *Farris v. Sec'y of HHS,* 773 F.2d 85, 90

(6th Cir. 1985) (citation omitted). *See also Bowen v. Yuckert,* 482 U.S. 137 (1987). If the

individual does not have a severe impairment, then a finding of nondisability is made and the

inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare

it to those in the Listing, 20 C.F.R. Part 404, Subpart P, Appendix 1. The Listing sets forth

certain impairments which are presumed to be of sufficient severity to prevent the performance

of work. 20 C.F.R. § 404.1525(a). Plaintiff's impairment need not precisely meet the criteria of

the Listing in order to obtain benefits. It is sufficient if the impairment is medically equivalent to

one in the Listing. 20 C.F.R. § 404.1520(d). To determine medical equivalence, the

Commissioner compares the symptoms, signs, and laboratory findings concerning the alleged

impairment with the medical criteria of the listed impairment. 20 C.F.R. § 404.1526(a). The

decision is based solely on the medical evidence, which must be supported by medically

acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 404.1526(b). If the

impairment meets or equals any within the Listing, the Commissioner renders a finding of

disability without consideration of the individual's age, education, and work experience. 20

C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.,* 667 F.2d 524, 528 (6th Cir. 1981). Fourth, if

the individual's impairments do not meet or equal any in the Listing, the Commissioner must

determine whether the impairments prevent the performance of the individual's regular previous

employment. If the individual is unable to perform the relevant past work, then a prima facie

case of disability is established and the burden of going forward with the evidence shifts to the

4

Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048, 1053 (6th Cir. 1983); *Kirk*, 667 F.2d at 529.

Plaintiff has the burden of proof at the first four steps of the sequential evaluation process. *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *Wilson*, 378 F.3d at 548. *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *Wilson*, 378 F.3d at 548.

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded

substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor. *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(I)(ii);

6

*Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

### MEDICAL RECORD

Plaintiff began treating with Dr. Jane Blinzler, M.D., at Alliance Primary Care in December 2002. (Tr. 194-96). A treatment note from Alliance Primary Care dated December 26, 2006, lists plaintiff's complaints as dizziness, numbness on her left side, and a three-day history of double vision when she looked to the right. (Tr. 193).

Plaintiff presented to the emergency room at Mercy Franciscan Hospital on December 27, 2006, complaining of double vision and numbness and tingling in her left arm and leg occurring over three days. (Tr. 172-77). She was diagnosed with diplopia[2] and possible MS. Plaintiff was referred to neurologist Arthur Hughes, M.D.

Plaintiff saw Dr. Hughes that same month. (Tr. 152-61). During the initial exam, she reported horizontal double vision beginning six days earlier and reported that she had

---

[2]The term "diplopia" means double vision. McGraw-Hill Concise Dictionary of Modern Medicine. © 2002 by The McGraw-Hill Companies, Inc., http://medical-dictionary.thefreedictionary.com/diplopia. (last accessed August 23, 2011).

7

experienced a similar episode two years earlier. (Tr. 160-161). Plaintiff also reported left-sided numbness and some neck pain, which had worsened over the past few days. (Tr. 160). Dr. Hughes found that plaintiff had some weakness of her right lateral rectus muscle; some left-sided neck pain with left lateral bending of her neck and rotation of her neck to the right side, but no tenderness; some difficulty hopping on her left foot as compared to her right; and some diminished light touch sensation affecting her left hand and left foot. Dr. Hughes noted plaintiff's gait was otherwise unremarkable. Tendon reflexes were symmetrical and plantar reflexes were flexor. There was no weakness or drift of the extremities on motor examination. (Tr. 160). An MRI of plaintiff's brain taken on January 3, 2007, revealed several abnormalities. (Tr. 157-158). After reviewing the MRI, Dr. Hughes opined that a diagnosis of multiple sclerosis was "most likely" and referred plaintiff to the MS clinic at University Hospital for further treatment. (Tr. 157). On January 11, 2007, Dr. Hughes wrote a letter stating that plaintiff was under his care "for a neurological disorder which will require continuous treatment over an extended period of time and may prevent her from employment." (Tr. 155).

Plaintiff saw neurologist Joseph Broderick, M.D., at Aring Neurology on January 25, 2007, for evaluation and lab work. (Tr. 215-68). Plaintiff complained of tingling and numbness of her left hand and arm which began at Christmas and had occurred a handful of times for a day or two over the preceding two years; horizontal diplopia; left neck and occipital pain; fatigue; and leg shakiness. (Tr. 216). The tingling, fatigue and walking had recently improved, but the diplopia remained. Upon examination, Dr. Broderick found that plaintiff had right 6th nerve palsy and mild lower right central palsy at cranial nerve VII; she was unable to tandem well and

8

had a mild ataxic-wide based gait[3]; her left finger tapping was minimally slow; and she had

increased reflexes in all areas tested, except the Babinski reflexes were absent. (Tr. 217-218).

Her muscle strength was 5/5 in all major muscle groups and muscle tone was normal in all

muscle groups of the upper and lower extremities. Dr. Broderick diagnosed plaintiff with

relapsing remitting multiple sclerosis (RRMS) and recommended that she start IV Solu-Medrol.

(Tr. 218). Dr. Broderick referred plaintiff to Dr. Melanson at the Hoxworth Blood Center

(University Hospital Neurology Clinic). (*Id.*).

Plaintiff began treatment at the Neurology Clinic in January 2007 and was treated there

regularly through April 2008. (Tr. 181-88, 206-10, 334-47). On February 6, 2007, plaintiff

complained of symptoms which had started on December 24, 2006, and included fatigue; left-

sided weakness; numbness and tingling in her left arm and hand; horizontal diplopia; neck and

occipital pain; and trouble swallowing liquids, which had since resolved. (Tr. 184).

Examination revealed decreased sensation to temperature in plaintiff's left lower leg;

disconjugate gaze; right LR palsy; slight unsteadiness with tandem gait; and slightly decreased

muscle strength in both hip flexors. (Tr. 184-85). It was noted that plaintiff had not seen any

"significant improvement" after taking Solu-Medrol, and interferon therapy was considered.

(*Id.*). By February 27, 2007, plaintiff was improved but still had right 6th cranial nerve palsy and

mild diplopia. (Tr. 182). Plaintiff was started on Betaseron. (Tr. 183). Plaintiff was showing

some signs of improvement when she returned in April 2007. (Tr. 208-09). Her only symptom

was double vision when looking to the right. It was recommended that she continue Betaseron

---

[3]Ataxia is "incoordination and unsteadiness due to the brain's failure to regulate the body's posture and regulate the strength and direction of limb movements." It is usually a consequence of a disease of the brain. http://www.medterms.com/script/main/art.asp?articlekey=2375 (last accessed August 18, 2011).

treatments. (*Id.*). When plaintiff returned in October 2007 her only complaint was double vision. (Tr. 346-47). Examination revealed some slight irregularities of the left pupil. (Tr. 347). There was no recurrence of plaintiff's RRMS. Plaintiff was advised to avoid heat; engage in gentle exercise; and get adequate sleep. She was instructed to call if she experienced visual changes or for other reasons which are not legible. Plaintiff was to have a follow-up examination in six months. (*Id.*).

Plaintiff was next seen at the Neurology Clinic in April 2008. (Tr. 338-342). She complained of "rare fatigue" but had no new complaints of numbness, weakness or visual difficulties. (Tr. 338). Side effects of her medications were bruising and minimal pain. (*Id.*) She displayed "very mild ataxia with tandem forward and backward;" posturing of her right arm with stressed gait; and hyperreflexia. (Tr. 339). Plaintiff was diagnosed with "RRMS" (relapsing/remitting multiple sclerosis), stable on Betaseron therapy. (*Id.*). She was instructed to call if she experienced vision problems or muscle weakness or incoordination which interfered with her walking or use of hands. (*Id.*). Plaintiff was instructed as to gentle exercise, heat avoidance, and sleep. (*Id.*). She was to follow-up in one year or if she experienced new symptoms. (*Id.*).

Plaintiff became pregnant in the summer of 2008 and miscarried in September 2008. (Tr. 270). She was seen at Bethesda Trihealth Good Samaritan on September 19, 2008. (Tr. 270-289). Plaintiff admitted using marijuana during the last two months and as recently as that day. (Tr. 289). The social history reported "[p]ositive marijuana use" but noted that plaintiff had denied any drug use in the social work consult. (Tr. 270).

10

During a second pregnancy in 2009, plaintiff was again off her medication with no report of recurrent multiple sclerosis symptoms. (Tr. 309-33). In August 2009, plaintiff was evaluated by an obstetrician several days prior to her estimated due date. (Tr. 331). It was noted that plaintiff had a history of multiple sclerosis, but there were no signs or symptoms of exacerbation. (Tr. 332). While being followed for her pregnancy, plaintiff had positive drug screens for marijuana on March 19 and June 24, 2009. (Tr. 302, 321).

A physician from Alliance Primary Care completed a questionnaire at the request of the state agency in March 2007.[4] (Tr. 189-91). Most of the report is illegible. It was reported that plaintiff had left arm and left leg symptoms of an undefined nature. The pertinent findings were listed as dizziness and double vision beginning in December 2006 and Marcus Gunn pupil[5] beginning in December of 2007. (*Id.*). The work limitations included an inability to tolerate heat or cold, and a limitation relating to dizziness which is not entirely legible. (Tr. 191).

In June 2007, state agency physician Dr. Elizabeth Das, M.D., reviewed the file and completed an RFC assessment. (Tr. 198-205). She opined that plaintiff could lift and/or carry and push and/or pull up to 20 pounds occasionally and 25 pounds frequently; she could stand/ walk and sit about 6 hours in an 8-hour workday; she could not climb ladders/ropes/scaffolds; she had visual limitations as to depth perception; and she should avoid concentrated exposure to extreme cold and heat and workplace hazards, such as machinery and heights. Dr. Das stated that she was giving weight to Dr. Blinzler's assessment because it was the most recent report on

---

[4]The report is not signed but plaintiff states it was completed by Dr. Jane Blinzler, M.D.

[5]The Marcus Gunn pupil is a relative afferent pupillary defect, which is defined as "asymmetry of the pupillomotor input between the two eyes." Stedman's Medical Dictionary (Lippincott Williams & Wilkins 2006).

plaintiff's condition and limitations. (Tr. 205). She stated she was giving slightly less weight to the findings of Dr. Broderick, Dr. Hughes, Hoxworth and Mercy Franciscan, but their findings were consistent. (*Id.*). In September 2007, another state agency reviewing physician, Paul Morton, M.D., affirmed Dr. Das' assessment as written. (Tr. 211).

Dr. Joseph Nicolas, M.D., a physician with University Hospital's Neurology Clinic, completed a Basic Medical form for the Ohio Department of Job and Family Services, which has a fax-stamped date of December 1, 2007. (Tr. 213-14). Dr. Nicolas listed plaintiff's diagnoses as multiple sclerosis, with a history of diplopia and right and left leg weakness. (Tr. 213). Dr. Nicolas noted that plaintiff's condition was "good/stable" with treatment and she was "doing well on Betaseron." (Tr. 213). Dr. Nicolas opined that plaintiff's ability to stand and walk was affected by her medical condition; she could frequently lift/carry up to five pounds; she was moderately limited in her ability to push/pull, to handle, and to perform repetitive foot movements; and she was not limited in her ability to bend, reach, see, hear, or speak. (*Id.*). The only medical evidence Dr. Nicolas cited to support his findings were 4+/5 strength in plaintiff's right hip flexor and 4-/5 strength in her left hip flexor. (*Id.*).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that she lives with her mother and her 2½ week old baby. (Tr. 25). She has a driver's license but drives very little. (*Id.*). Plaintiff testified that she has no history of street drug use. (Tr. 26). She is able to read and write. (*Id.*). She testified that she had not "worked in quite some time" and that she babysat in her spare time for a couple of years after her last job, but not on a full-time basis. (*Id.*).

Plaintiff testified that she first began experiencing MS symptoms in December 2006. (Tr. 27). She sees Dr. Melanson at Hoxworth/University Hospital Neurology Clinic regularly and she saw Dr. Broderick once. (Tr. 28, 38). She does not see Dr. Nicolas, nor does she know who he is. (Tr. 38). She testified that she still has tingling in her leg and arm on the right side, and her double vision returns when she gets overheated. (Tr. 28). Plaintiff reported that she gets overheated easily and simply being out in the sun and sweating is enough to cause her to become overheated. (Tr. 32). Plaintiff also testified that she always has to rest because she has "bad fatigue." (Tr. 28). If she exerts herself, she gets "very tired," she cannot move much, and it becomes difficult to do things. (Tr. 32). Plaintiff testified that she is right-handed, and her right side is currently predominantly affected by her MS. (Tr. 32). She tends to drop things, her balance is not very good, it is hard for her to walk down the steps, and she always stumbles. (Tr. 32-33). However, she does not use a cane or any other assistive device. (Tr. 33). Plaintiff testified that she avoids certain activities because of her balance issues and her fear that if she becomes exhausted and overheated she might experience a bad relapse. (Tr. 33-34). Plaintiff also testified that she cannot stand in one spot because her right leg bothers her too much. (Tr. 34). Plaintiff estimated that she can walk about 15 minutes before she needs to sit or lie down, and can sit for 15 or 20 minutes before she needs to stand or lie down. (Tr. 35). She testified that lying down is most comfortable for her. (*Id.*). Plaintiff testified that she sometimes wakes up gasping for air and is unable to breathe. (Tr. 36). She wakes up multiple times during the night because of bad cramping in her legs, and she naps once or twice during the day for about an hour. (Tr. 36). She testified that she has problems with her hand/eye coordination. (Tr. 37).

13

As to her daily activities, plaintiff testified that her family members assist her in all the household chores and in caring for her newborn baby. (Tr. 35-36). She stated that she sometimes needs help getting dressed, and she does not wear clothes with buttons because she cannot button them. (Tr. 33). She spends most of her day "sit[ting] around the house and watch[ing] TV and now [she tries] to take care of the baby as much as [she] can." (Tr. 37).

Plaintiff explained that she has had two pregnancies since being diagnosed with MS, with the first beginning in June of 2008 and ending in a miscarriage in September 2008. (Tr. 28-29). She became pregnant again in December 2008, and gave birth shortly before the hearing. (Tr. 29). She was not on Betaseron during her pregnancies. (Tr. 28).

Plaintiff testified that the Betaseron injections she administers to herself every other day help a little bit with her MS symptoms. (Tr. 30). She suffers side effects of bad bruising, soreness and muscle pain at the injection site, and pain in her whole leg for a couple of days if she injects herself in the leg. (Tr. 30). She has to lie down for at least a few hours after each injection. (Tr. 31).

### THE VOCATIONAL EXPERT AND THE HYPOTHETICAL QUESTION

The ALJ asked the VE to consider an individual who was limited to light work but who could not climb ladders/ropes/scaffolds; whose depth perception was limited so that they would have to avoid hazards, machinery and heights; and who should avoid extreme cold and heat and outdoor work. (Tr. 39-40). The VE testified that the hypothetical individual could perform work as a babysitter; attendant; and general office clerk. (Tr. 40). Assuming the person was limited to sedentary work with the same restrictions listed above, the VE testified the hypothetical individual could perform jobs as a security monitor, general office worker; general laborer (but

14

not in the construction field), and credit authorization clerk.  (Tr. 40-41).  The VE testified that if

the hypothetical person needed the option to alternate sit/stand positions every half-hour, she

could still do the sedentary jobs he identified.  (Tr. 41).  The VE also testified that plaintiff would

be able to perform many of the sedentary jobs he listed given the limitations found by Dr.

Nicolas, including the 5-pound lifting restriction.  (Tr. 41-42).  The VE testified that if plaintiff's

testimony about her symptoms and limitations were found credible, she would be unable to

sustain competitive work.  (Tr. 42).

When questioned by plaintiff's counsel, the VE testified that if the term "moderately

limited" as used by Dr. Nicolas were defined as being unable to perform an activity for an hour

out of the work day, then plaintiff could "do the job" but eventually she would be unproductive

and would become unemployable.  (Tr. 43-44).  The VE further testified that if plaintiff suffered

double vision on a routine basis, this would probably preclude her from working.  (Tr. 45).

### OPINION

Plaintiff assigns three errors in this case: (1) the ALJ failed to properly analyze whether

plaintiff's impairment meets Listing 11.09; (2) the ALJ erred by failing to accord sufficient

weight to the opinions of the treating physicians; and (3) the ALJ erred in assessing plaintiff's

credibility.

### I.   The ALJ did not fail to properly analyze whether plaintiff's impairment meets Listing 11.09.

In order to satisfy Listing 11.09, a claimant must have multiple sclerosis accompanied by

one of the following:

A. Disorganization of motor function as described in 11.04B; or

15

B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or

C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process.

Listing 11.04B states in full: "Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." 11.00C in turn provides as follows:

11.00C: *Persistent disorganization of motor function* in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

In her decision, the ALJ addressed the argument made by counsel at the hearing that plaintiff's MS meets Listing 11.09. (Tr. 13). The ALJ determined that plaintiff's MS does not meet the Listing because the evidence does not "document listing level effects of multiple sclerosis present for a period of 12 months or more, such as disorganization of motor function, visual impairment, or substantial muscle weakness on repetitive activity." (*Id.*). The ALJ noted that when plaintiff reported initial symptoms in the emergency room in December 2006, she was alert, ambulatory, and moving all extremities. (*Id.*, citing Tr. 172). The ALJ further noted that while plaintiff was still in an untreated state the following month, Dr. Broderick reported that she had a wide-based gait and could not tandem gait well, but she was ambulatory, she had normal muscle tone, and she had rapid alternating movement within normal limits. (*Id.*, citing Tr. 162-166). The ALJ further noted that plaintiff improved with IV steroid infusion and she was doing

16

better once on Betaseron in late February 2007, reporting diplopia only when looking to the right. Moreover, she had not experienced any recurrent MS symptoms in April 2007 (*Id.*, citing Tr. 334-347); she was not seen in follow-up for a year after that and she had no new complaints when she was seen (Tr. 13-14); and she was off her medication in September 2008 and had no new complaints at that time.  (Tr. 14).

Plaintiff contends that the ALJ ignored her persistent symptoms, including pain; weakness of the extremities; balance problems; diplopia; easy fatigability; and the fact that she becomes weak and fatigued with minor activity or with exposure to sunlight and warm weather. (Doc. 16 at 9).  Plaintiff further asserts that the ALJ applied an improper standard for determining whether she has "persistent disorganization of motor function" as required by Listing 11.09.  (*Id.*).  Plaintiff claims that the evidence clearly shows that she experiences "disorganization of motor function" as demonstrated by the persistent difficulty she experiences getting up from a seated position and by her ataxia problems while standing and walking.  (Doc. 16 at 11, citing Tr. 165, 185, 214, 218, 339).  Plaintiff also argues that the records show she has a persistent diplopia and 6th cranial nerve palsy which is made worse with certain eye movements. (*Id.*, citing Tr. 160, 163-164, 182-184, 190-193, 208, 216-217, 347).  Plaintiff further claims she has experienced sensory changes in the form of tingling and numbness in her hands, as well as muscle weakness and fatigue.  (*Id.*, citing Tr. 160, 163, 172, 182, 184-185, 216, 338-339, 347). Plaintiff contends that although the severity of her symptoms varied, this is consistent with her diagnosis of RRMS.

The Commissioner contends that multiple sclerosis is not per se disabling under the Social Security Regulations and under the law of this Circuit.  *See Jones v. Secretary of Health*

*and Human Services,* No. 93-1958, 1994 WL 468033, at *3 (6th Cir. 1994) (citing *Dettloff v.*

*Secretary of Health & Human Servs.*, No. 92-2507, 1993 WL 503086 (6th Cir. Dec. 7, 1993);

*Linton v. Secretary of Health & Human Servs.*, No. 90-1715, 1991 WL 150804 (6th Cir. Aug. 5,

1991); *Biltoft v. Bowen*, No. 88-3659, 1989 WL 46138 (6th Cir. May 5, 1989); *Headrick v.*

*Secretary of Health & Human Servs.*, No. 87-1939, 1988 WL 120897 (6th Cir. Nov. 14, 1988)).

The Commissioner argues that plaintiff has not shown she meets Listing 11.09 because nearly all

of the medical findings she cites to support her argument cover the period December 2006 to

April 2007, shortly after she started taking Betaseron for her illness; she did not seek treatment or

report new complaints while pregnant and off of Betaseron for the period spanning June 2008

through August 2009; and no state agency physician or any of her treating physicians have ever

opined that her condition is disabling.  (Doc. 21 at 7).

      The Court finds that the ALJ did not err by determining plaintiff's condition does not

satisfy Listing 11.09.  First, insofar as plaintiff is alleging that her MS satisfies 11.09B (*see* Doc.

16 at 11), she has failed to show that the 11.09B criteria are satisfied.  At the ALJ hearing,

counsel expressly stated he was foregoing any argument that plaintiff has a visual impairment

that meets 11.09B because her visual impairment was "only temporary." (Tr. 47).  Moreover, in

her Statement of Errors, plaintiff makes no attempt to demonstrate she has a visual impairment as

described under either Listing 2.02, 2.03 or 2.04, which she must show in order to satisfy Listing

11.09B.  Simply alleging that the records show she has a persistent diplopia and 6th cranial nerve

palsy which is made worse with certain eye movements is not sufficient to demonstrate she

satisfies the Listing.

Second, substantial evidence supports the ALJ's determination that plaintiff's MS does not satisfy the criteria of 11.09C. "The criteria in 11.09C deal with motor abnormalities which occur on activity." Listing 11.00E. Use of the Listing 11.09C criteria depends upon "(1) documenting a diagnosis of multiple sclerosis, (2) obtaining a description of fatigue considered to be characteristic of multiple sclerosis, and (3) obtaining evidence that the system has actually become fatigued." *Id.* "The evaluation of the magnitude of the impairment must consider the degree of exercise and the severity of the resulting muscle weakness." *Id.*

To demonstrate she meets Listing 11.09C, plaintiff cites to medical records which demonstrate that she experienced numbness, tingling, and some fatigue and muscle weakness, primarily when she was first diagnosed. (*See* Tr. 193, 12/26/06-complaints of dizziness and numbness; Tr. 172, 12/27/06-complaints of tingling and numbness in the left arm, hand and leg; Tr. 216, 1/25/07-history of tingling and numbness with fatigue and shakiness of the legs; Tr. 184-185, 2/6/07-slight unsteadiness with tandem and slightly decreased hip strength). These records document the symptoms plaintiff alleges but do not show that they were sufficiently severe to satisfy the Listing. A number of the records plaintiff cites make no mention whatsoever of fatigue or muscle weakness[6] (*see* Tr. 160, 192, 347), and those that do provide no indication that these symptoms were more than mild or that plaintiff experiences fatigue or muscle weakness with activity. In addition, the medical records document prompt improvement in plaintiff's condition once she began treatment. (*See* Tr. 216-217, 1/25/07-tingling, fatigue and walking had recently improved; muscle strength was 5/5 is all major muscle groups and muscle tone was normal in all muscle groups of the upper and lower extremities; Tr. 184-185, 2/06/07-left-sided

---

[6]Some of the handwriting in the records is illegible.

19

numbness and weakness significantly improved prior to steroids; muscle strength 5/5 upper and

5/5 lower except for hip flexors, which were 4+ on right and 4- on the left; Tr. 182-183, 2/27/07-

plaintiff improved but had "some mild diplopia" and right 6th cranial palsy; system review

negative for all other symptoms, including numbness, tingling, and weakness; Tr. 208, 4/24/07-

plaintiff doing better; diplopia when looking to the right was the only symptom; Tr. 346,

10/02/07-no recurrence of numbness, weakness, or blurred vision and no complaints of fatigue).

Thus, the medical evidence does not support a finding that plaintiff suffered "[s]ignificant,

reproducible fatigue of motor function with substantial muscle weakness on repetitive activity"

so as to satisfy Listing 11.09C.

Third, substantial evidence supports the ALJ's determination that plaintiff does not

experience "disorganization of motor function" so as to satisfy Listing 11.09A. Plaintiff claims

that she meets Listing 11.09A as demonstrated by the persistent difficulty she allegedly

experienced getting up from a seated position and by her ataxia problems while standing and

walking. (Doc. 16 at 11, citing Tr. 165, 185, 214, 218, 335). Plaintiff argues that the ALJ

determined otherwise because she did not understand the Listing for multiple sclerosis and

applied the wrong standard for determining "disorganization of motor function" as evidenced by

her comments at the hearing. (Id., citing Tr. 48). However, there is no indication that the ALJ

applied the wrong criteria in her decision. In any event, the medical evidence does not show that

plaintiff meets the correct standard for "disorganization of motor function." Plaintiff cites

medical evidence that shows she experiences some ataxia and that her standing and walking are

affected by her disease. (See Tr. 218, 1/25/07-ataxic wide-based station and gait noted; Tr. 185,

2/06/07-slight unsteadiness with tandem noted; Tr. 214-Dr. Nicolas' assessed that standing and

walking are affected; Tr. 339, 4/20/08-notation that plaintiff had very mild ataxia with tandem forward and backward). However, there is no evidence that these symptoms were so severe as to satisfy Listing 11.09A.

Thus, the ALJ did not err by finding that plaintiff's impairment does not satisfy the criteria of Listing 11.09. The ALJ's determination in this regard is supported by substantial evidence and should be upheld.

## II.  The ALJ did not err by failing to accord sufficient weight to the treating physicians' opinions.

Plaintiff claims that the ALJ erred by failing to accord sufficient weight to the opinions of Dr. Nicolas, a neurologist, and Dr. Blinzler, both of whom she characterizes as treating physicians. (Doc. 16 at 14-16). Plaintiff contends that the ALJ was not entitled to accord any weight to the opinion of the state agency reviewing physician, Dr. Das, because she is an anesthesiologist with no expertise in MS; Dr. Das disregarded the opinions of Dr. Nicolas and Dr. Blinzler and her opinion is not consistent with their opinions and with the medical evidence; and Dr. Das had no opportunity to examine plaintiff.

The Commissioner contends that the ALJ reasonably weighed the opinion evidence. The Commissioner argues that the ALJ was entitled to credit the opinion of Dr. Das over the opinions of Drs. Nicolas and Blinzler. The Commissioner argues that the ALJ was not required to address the questionnaire plaintiff attributes to Dr. Blinzler because it is undated, unsigned, and largely illegible; and the only limitations Dr. Blinzler imposed were an inability to tolerate heat and cold and a limitation due to dizziness. (See Tr. 189-196). The Commissioner further contends that the ALJ reasonably concluded based on plaintiff's testimony at the hearing that Dr. Nicolas was

not her treating source, and the ALJ also reasonably determined that Dr. Nicolas' five-pound lifting limitation was not supported by the remainder of the record evidence.

A review of the record shows that the ALJ's decision to give no significant weight to Dr. Nicolas' functional assessment limiting plaintiff to lifting five pounds is supported by substantial evidence. First, the ALJ properly decided based on plaintiff's testimony at the ALJ hearing that Dr. Nicolas was not a treating source. (Tr. 17). Plaintiff testified she does not see Dr. Nicolas and she does not know who he is. (Tr. 38). Moreover, although plaintiff cites to a number of medical records in support of her claim that Dr. Nicolas based his opinion on his examinations and treatment of her and upon his review of all the clinic records available to him (Doc. 16 at 15, citing Tr. 181-88, 206-10, 334-47), none of the clinic records bear Dr. Nicolas' signature. The only document signed by Dr. Nicolas is the basic medical assessment he completed, and Dr. Nicolas did not list a date of last exam in the space provided on that form. (Tr. 213-214). Thus, there is no indication in the record that Dr. Nicolas ever examined plaintiff. Dr. Nicolas' findings and opinion are therefore not entitled to the deference normally accorded the opinions of a treating physician.

Furthermore, the ALJ reasonably determined that the record evidence did not support the five-pound lifting limitation imposed by Dr. Nicolas. The ALJ noted that Dr. Nicolas indicated plaintiff was doing well on Betaseron and was stable; the only clinical findings he set forth in support of his assessment were hip flexor strength of 4+/5 on the right and 4-/5 on the left, which were near normal; and the record showed no symptoms of active MS and no documentation of significant motor weakness. (Tr. 17). Accordingly, the ALJ did not err in deciding not to give significant weight to Dr. Nicolas' opinion.

22

Second, contrary to plaintiff's argument, the ALJ did not disregard the opinion purportedly submitted by Dr. Blinzler, plaintiff's family physician. (Tr. 190-91). Rather, the ALJ attributed the report to plaintiff's "primary care physician" and took the opinion into account. (Tr. 17, citing Tr. 189-196). The RFC incorporates the limitations in the report by restricting plaintiff from temperature extremes and imposing climbing and hazard restrictions due to dizziness with quick position changes. (*Id.*).

Finally, the ALJ's decision to accept Dr. Das' opinion that plaintiff could perform work within the light exertional range as an accurate assessment of plaintiff's functional capacity is supported by substantial evidence. (Tr. 17, citing Tr. 199-205). Plaintiff claims that Dr. Das rendered her opinion in June 2007, only six months after plaintiff's MS diagnosis; the opinion is entitled to less weight because Dr. Das is an anesthesiologist and the opinion is outside her area of specialty; Dr. Das reviewed only a small portion of the record; and Dr. Das ignored positive findings, including a complete right 6th cranial nerve palsy, hyperreflexia on both sides of plaintiff's body, an abnormal Babinski test bilaterally, and an ataxic wide-based gait. (Doc. 16 at 15, citing Tr. 164-165). However, the ALJ gave valid reasons for accepting Dr. Das' opinion. The ALJ found that Dr. Das cited medical evidence confirming plaintiff's MS diagnosis but showing normal motor strength in all of the major muscle groups; good overall coordination; and normal sensory examination for light touch, pinprick, vibration, and proprioception. (Tr. 17). Although plaintiff contends that Dr. Das' review of the record was incomplete because she assessed plaintiff in June 2007, plaintiff does not point to record evidence for the period following Dr. Das' review which documents an increase in the severity of her symptoms and shows that she is more limited than Dr. Das opined. To the contrary, plaintiff testified that she

took no medication during her two pregnancies (Tr. 28), and the medical evidence shows she had

no recurrence of her MS symptoms between April 2007 and December 2008.  (Tr. 334-347).

Thus, the ALJ's decision to accept Dr. Das' opinion concerning plaintiff's functional limitations

is supported by substantial evidence and should be upheld.

### III.  The ALJ's credibility finding should be upheld.

Plaintiff claims that the ALJ erred in assessing her credibility.  First, plaintiff argues that

it was error for the ALJ to rely on evidence she had used marijuana in the past because there is no

evidence marijuana impacted her multiple sclerosis.  Second, plaintiff contends that her

testimony denying she ever used street drugs has no bearing on her credibility.  Plaintiff asserts

that although she had two positive drug screens, they occurred within three months of each other

in March and June of 2009 and therefore likely reflected use over a very short period of time.

Plaintiff claims it is likely she forgot about her marijuana use given this brief time span and in

view of the fact that marijuana use has been shown to affect memory.  Third, plaintiff claims her

work history should have no bearing on her credibility because her work record is typical of a

young person who has been in the work force for only a few years.  Fourth, plaintiff alleges the

ALJ inaccurately determined that no treating or examining source found she is disabled.  Fifth,

plaintiff claims that the ALJ inaccurately determined there are few objective findings supporting

her complaints of pain and other limitations.  Plaintiff claims that in addition to numbness and

weakness in her upper and lower extremities, she experiences fatigue and double vision.  Plaintiff

also claims her Betaseron injections cause her to experience pain and flu-like symptoms, which

further limit her ability to work.  (Doc. 16 at 18, citing Tr. 30).

24

The Commissioner argues that the ALJ reasonably evaluated plaintiff's credibility. The Commissioner asserts that the fact plaintiff worked for some years and then inexplicably stopped working for a few years before the alleged disability onset date reflects negatively on her credibility (Doc. 21 at 11, citing Tr. 26, 110); her false testimony as to her history of drug use legitimately calls her credibility into question; and the ALJ took into account evidence of side effects from plaintiff's medication as well as her conservative course of treatment in accordance with the Social Security Regulations.

In light of the ALJ's opportunity to observe the individual's demeanor at the hearing, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir. 2001); *Kirk v. Sec. of H.H.S.,* 667 F.2d 524, 538 (6th Cir. 1981). "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994). The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst v. Sec. of H.H.S.,* 753 F.2d 517, 519 (6th Cir. 1985) (citing *Zblewski v. Schweiker,* 732 F.2d 75, 78 (7th Cir. 1984)).

Social Security Regulation 96-7p describes the requirements by which the ALJ must abide in rendering a credibility determination:

> It is not sufficient for the adjudicator to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

25

(emphasis added). The ALJ's credibility decision must also include consideration of the following factors: 1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c); SSR 96-7p.

Here, the ALJ clearly stated his reasons for finding plaintiff's testimony was not credible insofar as she complained of disabling symptoms. Plaintiff did not work steadily prior to the alleged disability onset date (*see* Tr. 110), and she gave nebulous testimony about her work history at the hearing. (Tr. 26). Thus, it was reasonable for the ALJ to infer that she did not necessarily stop working because she was disabled. (Tr. 17). Furthermore, the ALJ reasonably relied on plaintiff's testimony regarding her use of street drugs in negatively assessing her credibility. Although plaintiff offers various excuses for why she may have testified at the ALJ hearing that she had never used street drugs (*see* Tr. 26), she does not deny she had positive drug screens just months before the ALJ hearing. (Tr. 302, 321). The ALJ properly found that her false denial of illegal drug use reflected negatively on her credibility.

Furthermore, the ALJ reasonably determined there is no evidence plaintiff suffers adverse side effects from medication or treatment which would prevent her from working. Plaintiff testified at the hearing that her Betaseron injections cause her to suffer headaches, bruising,

26

muscle pain in her arm, and muscle pain in her entire leg for a few days following an injection in the leg. (Tr. 30). Plaintiff further asserts that the medical records show she reported side effects of bruising and irritation at the injection site, "among other things." (Doc. 22 at 7). However, the record evidence plaintiff cites shows she was tolerating her medicine well with no side effects in October 2007 (Tr. 346), and the only side effects she reported in April 2008 were bruising and minimal pain. (Tr. 338). In addition, the ALJ correctly noted that plaintiff's treatment has been conservative; she testified she took no medication during her two pregnancies (Tr. 28); and the medical evidence shows she had no recurrence of her MS symptoms between April 2007 and December 2008. (Tr. 17, citing 334-347). The April 2008 Neurology Clinic report noted plaintiff was stable on Betaseron; she was to call if she experienced vision symptoms, muscle weakness, or incoordination interfering with walking or the use of her hands; and the plan was for her to follow-up in one year or whenever she experienced new symptoms. (Tr. 339). The records do not show that plaintiff sought follow-up treatment or reported new symptoms after that date.

Thus, the ALJ reasonably relied on a lack of significant objective findings to find that plaintiff's subjective allegations of a disabling impairment were not credible. The ALJ's credibility finding is substantially supported by the record and should be upheld.

## CONCLUSION

In accordance with the foregoing, it is hereby **RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for SSI be **AFFIRMED**.

Date: __8/24/2011__

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

REBECCA LOHMAN,                                    Case No. 1:10-cv-628
    Plaintiff                                 Dlott, J.
                                            Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

### NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

28